**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ARC/CONNECTICUT, et al., | : | CIVIL ACTION NO. |
| **Plaintiffs** | : | 3:01CV1871 (JBA) |
| | : | |
| v. | : | |
| | : | |
| PETER H. O'MEARA, et al., | : | |
| **Defendants** | : | |
| | : | **August 16, 2004** |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

**Standards of Review**

Pursuant to the Court's instructions, the Defendants have consolidated all pretrial dispositive motions into a single motion for which the following standards of review are relevant.

A motion for judgment on the pleadings[1] is appropriate "[a]fter the pleadings are closed but within such time as not to delay the trial . . . ." Fed.R.Civ.P. 12(c). When deciding a Rule 12(c) motion, courts apply the same standard as that applicable to a motion under Rule 12(b)(6). *See* Ad-Hoc Comm. of Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College, 835 F.2d 980, 982 (2d Cir.1987). Under that test, a

---

[1] The Federal Rules of Civil Procedure require that a Rule 12(b)(6) motion to dismiss be made before the responsive pleading. The Defendants have already filed their answer, so the standard for a Rule 12 (c) motion for judgment on the pleadings is articulated above. Because the Defendants make arguments in this motion that arguably could have been made in a 12(b)(6) motion, the standard of review for a motion to dismiss is provided here. When considering a Rule 12(b) motion to dismiss, the court accepts as true all factual allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff. *See* Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Thomas v. City of N.Y., 143 F.3d 31, 37 (2d Cir.1998). In its review of a motion to dismiss, the court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." Samuels v. Air Transport Local, 504, 992 F.2d 12, 15 (2d Cir.1993). Dismissal is warranted when it is clear that no relief can be granted based on the set of facts alleged by the plaintiff. *See* Tarshis v. Riese Org., 211 F.3d 30, 35 (2d Cir.2000); Cooper v. Parsky, 140 F.3d 433, 440 (2d Cir.1998).

court must accept the allegations contained in the complaint as true and draw all reasonable inferences in favor of the non-movant. <u>Ad-Hoc Comm.</u> at 982. A court should dismiss the complaint if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957). However, if matters outside the pleadings are presented to the court and not excluded, the motion should be treated as one for summary judgment and disposed of as provided in Rule 56. Fed.R.Civ.P. 12(c).

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When there can be no difference between the conclusions of reasonable minds, summary judgment is proper. <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2nd Cir.), *cert. denied,* 502 U.S. 849 (1991). In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in a light most favorable to the non-moving party. <u>Bryant</u> at 982.

However, when a motion for summary judgment is properly supported by evidence, the nonmoving party may not rest upon mere allegations or denials of his pleadings, but rather must present significant probative evidence to establish a genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986). If the nonmoving party cannot sufficiently demonstrate an essential element of his case, then summary judgment is appropriate. <u>Celotex</u> at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial." Celotex at 322-23.  At the summary judgment stage, the function of the court is "to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  The moving party's burden is satisfied if it can point to an absence of evidence to support an essential element of nonmoving party's claim.  Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d. Cir.1995).

## I.    PLAINTIFFS' CLAIMS ARE BARRED BY RES JUDICATA AND COLLATERAL ESTOPPEL

### A.    RES JUDICATA

The Plaintiffs' claims in ARC/Connecticut, et al. v. O'Meara, et al. are barred by the principles of res judicata and collateral estoppel because the issues involving accessibility to community-based services for mentally retarded persons living with their families in Connecticut were settled by court order on November 1, 1993 as part of the class action lawsuit, Birks v. Lensink, Comm'r, Conn. Dept. of Mental Retardation, CV No. B-89-506 (JAC). (See Judgment on Stipulated Compromise in Birks v. Lensink attached hereto as Exhibit A.)

Under the doctrine of res judicata, or claim preclusion, a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action."  Rivet v. Regions Bank of Louisiana, 522 U.S. 470, 476, (1998) (quotation marks and citation omitted); See also Greenberg v. Bd. of Governors of the Fed. Reserve Sys., 968 F.2d 164, 168 (2nd Cir.1992); Maharaj v. Bankamerica Corp., 128 F.3d 94, 97 (2nd Cir.1997) ("[O]nce a final judgment has been entered on the merits of a case, that judgment will bar any subsequent litigation by the same parties or those in privity with them concerning 'the transaction, or series of

connected transactions, out of which the [first] action arose.'" (quoting Restatement (Second) of Judgments § 24(1) (1982))).  A settlement agreement has the same effect as a final judgment.  DiMartino v. City of Hartford, 636 F.Supp. 1241 (D.Conn. 1986).

On November 6, 1989, the Plaintiffs in Birks v. Lensink filed an Amended Complaint which described the Plaintiff class as:

> a class of retarded persons whose ages range from 18 and older, require daily care, and are unable to provide for their basic needs. The class is composed of persons who now live with their families or relatives and who desire to live in community-based group homes controlled by the defendant.  Amended Complaint at 5.

For several years, the parties engaged in extensive discovery and participated in lengthy mediation, which ultimately led to a compromise.  On July 23, 1993, the parties submitted a Joint Motion to Approve Compromise Of Class Action and a Joint Memorandum in Support of Motion For Compromise Of Class Action (hereinafter, "Joint Memo"), a copy of which is attached hereto as Exhibit B.  In the Joint Memo, the parties noted that they had "reached an agreement that has been implemented by the promulgation of new department policies" by the Defendant, DMR.  Joint Memo at 3. The Joint Memo also delineated a priority ranking system for residential placements, and restated the Commissioner's directive to the Department's regional directors, stating in relevant part:

> A person's priority status is determined by his or her needs.  No person who is eligible shall be excluded from consideration for available residential placements or supports on the basis of current place of residence.  Assignment of priority status is a critical activity and the revised protocols emphasize that importance.

Joint Memo at 3-4. The Joint Memo also noted that "protocols require that each region establish a waiting list ranked by priority." Joint Memo at 4. <u>This is the same waiting list for residential placement and priority ranking system that the Plaintiffs now criticize</u>. *See, e.g.,* <u>ARC/Conn.</u> Second Amended Complaint at p. 54, par. 133. Notice of the proposed settlement was published in accordance with the court's order of September 1, 1993, and on November 4, 1993, the District Court entered its Judgment on the Stipulated Compromise approving the class action settlement and closing that case. *See* Exhibit A.

On February 6, 2003, the Plaintiffs filed their Second Amended Complaint in <u>ARC/Conn.</u> (hereinafter, the "Complaint"), alleging that Connecticut's administration of its Home and Community-Based Waiver Program violates the Plaintiffs' rights. Like the class in <u>Birks v. Lensink</u>, the putative class in <u>ARC/Conn.</u> consists of mentally retarded adults receiving DMR services, who, in most cases, live with their families, and who desire to live in alternative community based group homes or other residential placements controlled by DMR. Most of the <u>ARC/Conn.</u> Plaintiffs also point to the DMR Residential Waiting List to demonstrate DMR's alleged shortcomings alleging, *inter alia*, that class members who need services that are not covered by the HCBW are "placed on a DMR Residential Waiting List for as long as a decade until DMR funding becomes available." *See* Second Amended Complaint at p. 3, para. 2. Although the language describing the Plaintiff classes differs in <u>Birks</u> and in <u>ARC/Conn.</u>, the class in <u>ARC/Conn.</u> consists of essentially the same individuals who settled their claims regarding community based care in <u>Birks</u>.

Plaintiffs have even made some of the same claims in <u>ARC/Conn.</u> that they made in <u>Birks</u>. As in <u>ARC/Conn.</u>, the <u>Birks</u> Plaintiffs claimed "that the defendant established

classifications for persons with mental retardation that in practice froze out all but a few class members from the Department's placement process."   Joint Memo at 2.   The ARC/Conn. Plaintiffs now claim that the protocols they helped to create in Birks prevent them from receiving community based services.  Complaint at 53-55.  In Birks, the Joint Memo noted that the "Plaintiffs claimed that the Department denied plaintiff class members equal protection of the law as made applicable by the Fourteenth Amendment to the United States [sic]."  Joint Memo at 2.  The plaintiffs in ARC/Conn. have again claimed that the Department has failed "to provide benefits that afford them and [sic] equal opportunity to obtain the same result, gain the same benefit, or reach the same result as that provided others."  Complaint at 4.

Although the Plaintiffs have added legal theories to their claims in ARC/Conn., focusing on DMR's administration of the Medicaid Waiver program, those claims are precluded because they are based on the same facts as the claims made in Birks.  "It is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies."  Saud v. Bank of New York, 929 F.2d 916, 919 (2nd Cir.1991) (citing Expert Elec., Inc. v. Levine, 554 F.2d 1227, 1234 (2nd Cir.), *cert. denied,* 434 U.S. 903 (1977);  *Accord*, In re Teltronics Servs., Inc., 762 F.2d 185, 193 (2nd Cir.1985) ("[n]ew legal theories do not amount to a new cause of action so as to defeat the application of the principle of res judicata").   The facts surrounding the claims in ARC/Conn. are the same facts the Plaintiffs relied on in Birks. In both cases, the Plaintiffs were demanding that DMR provide funding for alternative community residential placements, and in both cases the Plaintiffs claimed that DMR's

administration of its services and funding created inequalities that deprived them access to community-based care.

To the extent that the plaintiffs seek to relitigate claims they settled in <u>Birks</u>, they should be barred from doing so.

### B.    COLLATERAL ESTOPPEL

"Under collateral estoppel, once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue on a different cause of action between the same parties." <u>Kremer v. Chemical Const. Corp.</u>, 456 U.S. 461, 465 (1982) (citing <u>Montana v. United States</u>, 440 U.S. 147, 153 (1979); <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S. 322, 326, n.5 (1979). "Collateral estoppel, like the related doctrine of res judicata, has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." <u>Parklane,</u> 439 U.S. at 326 (citing <u>Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation</u>, 402 U.S. 313, 328-329 (1971).

In <u>Birks</u>, the issues of fact and law that were necessary to the judgment include the terms of the settlement, which was part of the Joint Memo and expressly incorporated into the court's November 4, 1993 final order. Without the settlement there would have been no final order. Among the facts recited in the Joint Memo were protocols and procedures that DMR put in place and was obligated to maintain. For example, the agreement noted that DMR created a priority ranking system: "Emergency placements for persons needing immediate placement for placement within three months; priority one for placement needs within one year; priority two for placements within two years; and

priority three for placement within five years." Joint Memo at 3. In response to these and other procedures that DMR implemented, the Plaintiffs agreed to settle the claims they made in <u>Birks</u>.

The Plaintiffs now criticize those procedures and protocols which were created, in part, by the <u>Birks</u> settlement, and claim that these procedures fail to meet relevant legal standards. Complaint at p. 54, par. 133, p. 64, par. 164, p. 67, par. 172. In <u>Birks</u>, the plaintiffs specifically claimed that the State was violating § 1983 and Equal Protection. After implementing the agreed upon procedures, the parties noted in the Joint Memo that "[i]n as much as the defendant has implemented these changes without the requirement of an order from this court, the parties see no practical purpose in requesting the court to enter an injunctive or declaratory orders [sic]." Joint Memo at 4. By this statement, the Plaintiffs essentially acknowledged that DMR's procedures no longer violated § 1983 or Equal Protection. To the extent that the Plaintiffs' claims in <u>ARC/Conn.</u> depend on issues of fact or law settled in <u>Birks</u>, they cannot litigate those claims again in <u>ARC/Conn.</u>

## II.    **PLAINTIFFS HAVE NO PRIVATE RIGHT OF ACTION TO ENFORCE PROVISIONS OF THE MEDICAID ACT**

### A.    **INTRODUCTION**

Plaintiffs' Complaint alleges that Defendants have violated certain statutory provisions of Title XIX of the Social Security Act, 42 U.S.C. §1396 *et seq*. (the "Medicaid Act" or the "Act"), as well as certain corresponding regulatory provisions. *See* Complaint at Part VI, "Causes of Action." Medicaid is a cooperative federal-state statutory health insurance program that provides funding to help states provide "medical assistance" to certain low income individuals and families. 42 U.S.C. §1396. "Medical assistance" refers to the payments which a state makes for all or part of the cost of

covered services. 42 U.S.C. §1396a. States voluntarily participate in the program and receive federal financial participation for their qualifying expenditures under approved Medicaid state plans. 42 U.S.C. §1396b. Each participating state has considerable discretion, within the confines of federal law, to design its own Medicaid program by submitting a state plan to the Secretary of Health and Human Services (HHS) (the "Secretary") for approval. 42 U.S.C. §1396a. If the Secretary finds that in the administration of a state plan there is a failure to "comply substantially" with the provisions of the Act, the Secretary is empowered to reduce or cut off federal financial participation to the state. 42 U.S.C. §1396c.

The Medicaid Act also contains provisions permitting the Secretary to grant a "waiver" of certain Medicaid Act requirements to allow a state to include as "medical assistance" for a limited number of recipients the cost of certain home and community-based services which would otherwise not be eligible for federal reimbursement. 42 U.S.C. §1396n(c). A waiver permits states, at their option, to make available home and community-based services to certain individuals who would otherwise require nursing home or other institutional care. Skandalis v. Rowe, 14 F.3d 173, 175 (2d Cir. 1994). As a condition for receiving approval of its waiver proposal, a state must demonstrate that the home or community-based services will cost less than institutional care. Skandalis at 175, citing 42 U.S.C. §1396n(c)(2)(D). In addition, the waiver request must give adequate assurance to the Secretary as to the per capita effectiveness of the waiver plan for the beneficiary population. Skandalis at 176, citing 42 U.S.C. §1396n(c)(1). The statute itself recites that the purpose of the Act's waiver provisions is to promote "cost-effectiveness and efficiency" in the Medicaid Program. 42 U.S.C. §1396n(b).

First and foremost, this case is about Plaintiffs' claims to entitlement to Medicaid "waiver" services under Connecticut's Home and Community-Based Waiver for Persons with Mental Retardation (the "Waiver"), though Plaintiffs predicate many of their claims on statutory provisions that apply generally to state Medicaid programs. This distinction is important because the viability of Plaintiffs' statutory claims must be considered in the context of the entire Medicaid Act, but particularly with regard to the Act's "waiver" provisions, which provide the bedrock for Plaintiffs' claims. However, when Plaintiffs' statutory Medicaid claims are considered under the standards set forth in precedential rulings by the United States Supreme Court culminating in <u>Gonzaga University v. Doe</u>, 536 U.S. 273 (2002), and in subsequent rulings by the Second Circuit and in other jurisdictions, it is evident that the relevant statutory provisions do not confer an enforceable private right of action under 42 U.S.C. §1983.[2] In addition, Plaintiffs cannot base their claims upon the accompanying federal regulations, since regulations do no more than "define" or "flesh out" the content of the rights created by the underlying statute, and cannot independently create new rights.

---

[2] <u>Gonzaga University v. Doe</u>, 536 U.S. 273 (2002) and other cases discussed herein have specifically addressed the issue of whether particular statutes confer a private right of action pursuant to §1983. However, the Court in <u>Gonzaga</u> also explained that "a court's role in discerning whether personal rights exist in the §1983 context should not differ from its role in discerning whether personal rights exist in the implied right of action context," since the initial inquiry in both cases involves a determination of whether or not a statute "confers rights on a particular class of persons." 536 U.S. at 285. Therefore, to the extent that Plaintiffs are claiming an implied right to enforce provisions of the Medicaid Act directly, as an alternative to using §1983, the same analysis set forth in this section also applies.

**B.      THE SUPREME COURT'S DECISIONS IN GONZAGA
UNIVERSITY v. DOE AND OTHER CASES DEMONSTRATE
THAT STATUTES PROMULGATED UNDER CONGRESS'
SPENDING POWER, LIKE THE MEDICAID ACT, RARELY
CONFER A PRIVATE RIGHT OF ACTION**

**1.  Gonzaga University v. Doe**

Gonzaga University v. Doe, 536 U.S. 273 (2002) is the most recent in a line of

cases, beginning with Maine v. Thiboutet, 448 U.S. 1 (1980), in which the Supreme

Court has addressed the circumstances under which §1983 may be used to enforce rights

created by federal statutes.  The question presented in Gonzaga was whether a student has

a right sue a private university for damages under §1983 to enforce provisions of the

Family Educational Rights and Privacy Act (FERPA), which prohibit funding of

educational institutions that have a policy or practice of releasing education records to

unauthorized persons.  The Court concluded that the relevant provisions of FERPA do

not create any personal rights to enforce the statute under §1983.  Gonzaga at 276.  As

the Court noted: "In legislation enacted pursuant to the spending power, the typical

remedy for State noncompliance with federally imposed conditions is not a private cause

of action for noncompliance but rather action by the Federal Government to terminate

funds to the State."  Gonzaga at 280, quoting Pennhurst State School and Hosp. v.

Halderman, 451 U.S. 1, 28 (1981).

Pennhurst analogized spending clause legislation to a contract between the states

and the federal government where "in return for federal funds, the States agree to comply

with federally imposed conditions."  451 U.S. at 17.  Accordingly, the Supreme Court's

cases have "made clear that unless Congress 'speaks with a clear voice' and manifests an

'unambiguous' intent to confer individual rights, federal funding provisions provide no

basis for private enforcement by §1983." <u>Gonzaga</u>, 536 U.S. at 280, citing <u>Pennhurst</u>,

451 U.S. at 17, 28 and n.21.[3]  The <u>Gonzaga</u> Court made clear that a funding statute will

not easily be found to confer such rights, noting specifically that "since <u>Pennhurst</u>, only

twice [has the Court] found spending legislation to give rise to enforceable rights," in

<u>Wilder v. Virginia Hosp. Ass'n</u>, 496 U.S. 498 (1990) (holding that health providers could

enforce the Boren Amendment to the Medicaid Act, pursuant to §1983), and in <u>Wright v.

Roanoke Redevel. & Housing Auth.</u>, 479 U.S. 418 (1987) (holding that an amendment to

the Public Housing Act provided a cause of action under §1983).  <u>Gonzaga</u>, 536 U.S. at

280 (emphasis added).

        Five years before deciding <u>Gonzaga</u>, the Supreme Court, in <u>Blessing v. Freestone</u>,

520 U.S. 329 (1997), identified a three part "test" to determine whether a federal

"spending clause" statute may be read to confer enforceable rights upon individuals:

> First, Congress must have intended that the provision in question
> benefit the plaintiff.  Second, the plaintiff must demonstrate that the
> right assertedly protected in not so 'vague and amorphous' that its
> enforcement would strain judicial competence.  Third, the statute must
> unambiguously impose a binding obligation on the states.  In other
> words, the provision giving rise to the asserted right must be couched
> in mandatory, not precatory, terms."

520 U.S. at 340-41 (internal citations omited).  Notwithstanding the foregoing language,

the <u>Blessing</u> Court found that the statutory provisions of Title IV-D of the Social Security

Act, relating to state plan requirements for providing assistance to individuals in

---

[3]  "Medicaid" is one such federal funding program enacted pursuant to Congress' authority under the
Constitution's "spending clause" to expend funds for the general welfare.  It authorizes yearly
appropriations for the purposes of making grants to enable participating states to furnish "medical
assistance" to eligible persons. 42 U.S.C. §1396.

obtaining child support, were not privately enforceable by program beneficiaries.  The

Blessing Court noted that many provisions of the "multifaceted statutory scheme" of Title

IV-D, like the "substantial compliance" standard, are designed only to guide the state in

structuring its system-wide efforts at enforcing support obligations.  While these

provisions benefit individuals indirectly, the Supreme Court held that these mandates do

not give rise to individual rights.  520 U.S. at 344-45.

Subsequently, in Gonzaga, the Court cautioned that certain language in Blessing

which suggested that a statute could be enforceable if it simply reflects an "intention to

benefit" certain plaintiffs (e.g., "Congress must have intended that the provision in

question benefit the plaintiff") had led some courts to conclude improperly that a plaintiff

had the right to enforce a statute under §1983 "so long as the plaintiff falls within the

general zone of interest that the statute is intended to protect; something less than what is

required for a statute to create rights enforceable directly from the statute itself under an

implied private right of action."  Gonzaga, 536 U.S. at 282-83 (emphasis added).

Gonzaga clarified prior Supreme Court precedent by indicating that a statute which

requires a state to perform certain duties in order to receive federal funds does not create

new individual rights unless the "text and structure" of the statute plainly demonstrate a

Congressional intent to create enforceable rights.  536 U.S. at 286.  The Court pointedly

"reject[ed] the notion that our cases permit anything short of an unambiguously conferred

right to support a cause of action brought under §1983," stating that "it is rights, not the

broader or vaguer 'benefits' or 'interests' that may be enforced" under this section."  536

U.S. at 283 (emphasis in opinion).  "For a statute to create such private rights, its text

must be 'phrased in terms of the persons benefited'."  536 U.S. at 284 (citation omitted).

The Gonzaga Court concluded that the subject provisions of FERPA lack the "rights creating" language critical to showing the requisite evidence of Congressional intent to create new rights.  By comparison, the Court noted that examples of such "rights-creating" language may be found in Title VI of the Civil Rights Act of 1964 and Title IX of the Educational Amendments of 1972, both of which are phrased "with an unmistakable focus on the benefited class" clearly intended to create individual rights.[4] By contrast with these provisions, the Court found that the subject provisions in FERPA "speak only to the Secretary of Education, directing that 'no funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice'."  536 U.S. at 287.   Thus, when the focus is on a state's system-wide performance rather than on any individual rights or entitlements, a spending clause statute cannot confer a private right of action.

Following the Supreme Court's opinion in Gonzaga, a number of cases have been decided in various district and circuit courts involving attempts by private individuals to enforce legislation enacted pursuant to Congress' spending power, including a few involving provisions of the Medicaid Act.  While these cases have not provided a clear and consistent model for analyzing the statutory language, there is general agreement that

---

[4]  Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000(d) provides that:

> *No person* in the United States *shall* . . . be subjected to discrimination under any program or activity receiving Federal financial assistance" on the basis of race color or national origin.

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) provides that:

> *No person* in the United States *shall*, on the basis of sex . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance.

536 U.S. 273, 284 n.3 (emphasis in opinion).

in actions brought to enforce legislation enacted pursuant to Congress' spending power, Gonzaga requires a court to focus its inquiry on the "text and the structure" of the particular statute at issue in order to make a specific determination whether "Congress [has spoken] with a clear voice and manifest[ed] 'unambiguous' intent to confer individual rights before federal funding provisions will be read to provide a basis for private enforcement." 31 Foster Children v. Bush, 329 F.3d 1255, 1268, 1270 (11th Cir.), *cert. denied sub nom.*, Reggie B. v. Bush, 124 S.Ct. 483 (2003).

## 2.     Second Circuit Cases Following Gonzaga

Following Gonzaga, the Second Circuit has decided two cases addressing whether particular statutes create enforceable rights in light of Gonzaga and other precedents, Taylor v. Vermont Dep't of Educ., 313 F.3d 768 (2d Cir. 2002) and Rabin v. Wilson-Coker, 362 F.3d 190 (2d Cir. 2004). In Taylor, the Court of Appeals considered whether a §1983 action could be brought to enforce certain provisions of FERPA other than the provisions at issue in Gonzaga, which involved access to records. Significantly, the Court in Taylor noted that, although it had previously been settled law in the Second Circuit that these provisions *did* create enforceable rights under §1983, Gonzaga changed that conclusion. 313 F.3d at 782. According to the Taylor Court, Gonzaga "clarified" the court's role in a §1983 case by rejecting the sufficiency of an "intention to benefit" test and requiring a specific determination as to whether particular statutory language "'unambiguously confers an enforceable right' upon an identifiable class of beneficiaries." 313 F.3d at 783. The Second Circuit concluded that the provisions at issue in Taylor did not unambiguously confer such a right.

Analyzing FERPA's statutory language, the <u>Taylor</u> Court found that the provisions at issue "combine elements of both the funding-prohibition language that the <u>Gonzaga</u> Court held did not confer an individual right as well as the individually focused language that evidences an intent to create an enforceable right." 313 F.3d at 785. Notwithstanding the repeated use of the word "rights" in the statute (*e.g.*, the "right to inspect and review" educational records), the Court held that no statutory rights were created that are enforceable in a §1983 action. The Court concluded that there must not be any ambiguity in the text of a "spending clause" statute relating to the creation of individual rights. The <u>Taylor</u> Court found that while the provisions at issue clearly placed greater emphasis on the "rights" of parents and students than had the provision in <u>Gonzaga</u>, the language could be read as simply modifying the terms imposed on fund-receiving institutions, and therefore could not be said to create an "*unambiguously* conferred right," thereby precluding a private right of action. 313 F.3d at 785 (emphasis in opinion).[5]

<u>Rabin v. Wilson-Coker</u> involved a §1983 suit by Medicaid recipients seeking the right to receive "transitional medical assistance" (TMA) pursuant to 42 U.S.C. §§ 1396r-6 and 1396u-1, after they had become ineligible for benefits based on their earned income. The <u>Rabin</u> Court acknowledged that <u>Gonzaga</u> had set forth the relevant standard

---

[5]  As the Eleventh Circuit observed in <u>31 Foster Children v. Bush</u>, 329 F.2d 1255, 1270 (11th Cir. 2003), after <u>Gonzaga</u>, *any* ambiguity must be construed against finding enforceable rights:

> We take from Gonzaga the lesson that we are to look at the text and structure of a statute in order to determine if it unambiguously provides enforceable rights. If the text and structure 'provide no indication that Congress intends to create new individual rights, there is no basis for a private suit.' If they provide some indication that Congress may have intended to create individual rights, and some indication it may not have, that means Congress has not spoken with the requisite 'clear voice.' Ambiguity precludes enforceable rights. (citations omitted).

for determining whether particular statutory provisions are designed to convey enforceable rights on individual plaintiffs.  However, the Court found that the statutory language of Section 1396r-6, by speaking directly about the need to ensure that TMA be provided to "every individual," focuses "much more directly than does the FERPA provision (in Gonzaga) on the individual's entitlement" and does not contain the qualifying "policy or practice" language of FERPA.  The Rabin Court found that this reflected an unambiguous intention to confer a right to TMA for eligible recipients.  362 F.3d at 201-02.  However, the Court unaccountably made no attempt to examine the TMA provisions in light of the "text and structure" and/or other specific provisions of the Act, such as 42 U.S.C. §1396 and §1396c.  Moreover, since Rabin did not involve claims for Medicaid Waiver services, the Court had no reason to examine the "waiver" provisions of the Medicaid Act, particularly 42 U.S.C. §1396n(c), which are particularly relevant in the instant case, as discussed below.

The Rabin Court also stated that its conclusion in favor of finding enforceable rights was supported by "the only [two] relevant post-Gonzaga precedent from the Courts of Appeals," which it identified as Gean v. Hattaway, 330 F.3d 758 (6th Cir. 2003) and Bryson v. Shumway, 308 F.3d 79 (1st Cir. 2002).  362 F.3d at 202.  Defendants respectfully suggest that these two decisions lend little support to Rabin's conclusion, since they contain little, if any, meaningful analysis of the standards and methodology set forth in Gonzaga.  In addition, there are other post-Gonzaga Courts of Appeals decisions which also may be considered relevant in determining whether the language of particular statutes reflects a Congressional intent confer a private right of action.

In <u>Gean</u>, the Sixth Circuit considered, *inter alia*, a claim that Medicaid recipients did not receive notice and a "fair hearing" pursuant to enforce 42 U.S.C. §1396a(a)(3) when their Medicaid benefits were suspended or reduced.  330 F.3d at 772-73.  The Sixth Circuit denied the plaintiffs' Medicaid claim entirely, though the Court suggested in dicta that it was proper for the plaintiffs to bring a  §1983 action to enforce section 1396a(a)(3).  Although decided a year after <u>Gonzaga</u>, <u>Gean</u> *failed even to mention* <u>Gonzaga</u>, or even <u>Blessing</u>, although the <u>Gean</u> Court evidently attempted to apply the so-called <u>Blessing</u> test (*e.g.*, suggesting that §1396a(a)(3) "is phrased in terms of benefiting Medicaid recipients").  330 F.3d at 772-73.  *See*, <u>Blessing</u>, 520 U.S. at 340-41.  The <u>Gean</u> Court also relied on several pre-<u>Gonzaga</u> cases, though the viability of these earlier cases is questionable in light of <u>Gonzaga</u>.  Given the failure of <u>Gean</u> to even reference <u>Gonzaga</u>, let alone to acknowledge the admonition of <u>Gonzaga</u> that a mere intention to benefit without an *unambiguous* indication of an intent to establish an enforceable "right" is insufficient to create private right to support a cause of action enforceable under §1983, reliance on the dicta in <u>Gean</u> to infer the enforceability of Medicaid Act provisions is highly dubious.

The First Circuit Court in <u>Bryson v. Shumway</u> acknowledged <u>Gonzaga's</u> mandate that "a federal right must be 'unambiguously conferred' in order to support a cause of action under §1983."  However, focusing exclusively on the three-part <u>Blessing</u> test for its analysis of whether 42 U.S.C. §1396a(a)(8) was "intend[ed] to benefit the plaintiffs," the <u>Bryson</u> Court also failed to acknowledge the concern of <u>Gonzaga</u> about courts misinterpreting the language of <u>Blessing</u> by focusing on the "broader or vaguer 'benefits' or 'interests'" and thereby asking simply whether "the plaintiff falls within the general

zone of interest that the statute is intended to protect." 536 U.S. at 282-83. It is unclear whether the <u>Bryson</u> Court took this admonition into account in its analysis. Moreover, like <u>Gean</u>, <u>Bryson</u> relies upon other pre-<u>Gonzaga</u> cases which had found Section §1396a(a)(8) enforceable under §1983. Given that the precedential value of many earlier cases has been called into question by <u>Gonzaga</u>, <u>Bryson's</u> reliance on these cases undermines the reliability of that Court's opinion.

**3.    Other Post-Gonzaga Circuit Court Decisions**

<u>Bryson v. Shumway</u> also must be considered in conjunction with the First Circuit's more recent opinion in <u>Long Term Care Pharmacy Alliance v. Ferguson</u>, 362 F.3d 50 (1st Cir. 2004), which involved a suit by provider pharmacies to enforce certain Medicaid Act provisions dealing with drug reimbursements. While this was a suit by providers rather than Medicaid recipients, the First Circuit's analysis under the standards set forth in <u>Gonzaga</u> is both instructive and relevant to an analysis of whether a particular statute confers a private right of action. For example, the Court observed that "[p]rivate rights of action were once freely inferred from federal statutes that regulated conduct," but that "the ready inference in favor of private enforcement no longer applies." <u>Long Term Care Pharmacy Ass'n</u>, 362 F.3d at 57. Moreover, the Court noted that while plaintiffs in many cases previously might have relied upon §1983 to support a private right of action, "the Supreme Court recently closed that door as well in <u>Gonzaga University v. Doe</u>, . . . which indicated that nothing short of an unambiguously conferred right could support a claim under Section 1983 based on a federal funding statute." 362 F.3d at 57, citing <u>Gonzaga</u> at 282-83. Accordingly, the First Circuit found that, while a cause of action under 42 U.S.C. §1396a(a)(30)(A) would have been enforceable by

providers prior to Gonzaga, the suit was now precluded, given Gonzaga's mandate that such rights be based upon clear statutory language. 362 F.3d at 57-58. The Court also found, *inter alia*, that the Medicaid Act provides an ample enforcement mechanism by permitting the Secretary of Health and Human Services to enforce compliance with the Act's provisions and accompanying regulations by disapproving a state plan and by cutting off funds for violations. 362 F.3d at 57-58.

In Bruggeman v. Blagojevich, 324 F.3d 906 (7th Cir. 2003) (Posner, J.), the Seventh Circuit rejected claims by disabled adult plaintiffs to enforce alleged violations of Medicaid Act provisions. While the Court mentioned a "statutory entitlement" to services under 42 U.S.C. §1396a(a)(8) of the Act, the so-called "reasonable promptness" provision, the Court did not analyze whether the provision conferred a private right of action upon the plaintiffs, finding instead that the plaintiffs had failed to state any claim for medical services, since the Medicaid statute addresses only *financial* assistance and not the direct provision of services. Bruggeman, 324 F.3d at 910.[6] The Court specifically noted that another statutory claim based on the so-called "best interests" provision of the Medicaid Act, 42 U.S.C. §1396a(a)(19), could not be interpreted to create a private right of action, "given the Supreme Court's hostility, most recently and emphatically expressed in Gonzaga University v. Doe . . . to implying such rights in spending statutes." 324 F.3d at 911.

In 31 Foster Children v. Bush, 329 F.3d 1255 (11th Cir. 2003), the Eleventh Circuit held that a plaintiff class could not pursue a private right of action under §1983 to

---

[6] The Court also observed that this distinction between *medical* services and *financial* assistance had been missed by the First Circuit Court in Bryson v. Shumway, cited *supra*, and by the Eleventh Circuit in Doe v. Chiles, 136 F.3d 709 (11th Cir. 1998), a case decided five years before 31 Foster Children v. Bush, see discussion *infra*. 324 F.3d at 910.

enforce certain provisions of the Adoption Assistance and Child Welfare Act, which comprises part of Title IV of the Social Security Act, based on a careful analysis of statutory language and structure following Gonzaga.  Like the Medicaid Act, the Adoption Act establishes a program of payments to states which afford assistance to recipients, requires each state to submit a plan to the Secretary of Health and Human Services, and requires the state's programs to "substantially conform" to the approved plan or else the Secretary may withdraw or withhold federal funds.  31 Foster Children, 329 F.3d at 1270.  The Eleventh Circuit found that although the provisions at issue in 31 Foster Children appear to speak in individual terms, *e.g.*, referring to "a child's health and education record" provided at "each placement of the child" and to termination of parental rights of "the child's parents," these references are made in the context of a system-wide procedure designed to assure that certain desired steps are taken by the state. 329 F.3d at 1272.  The Court found that any ambiguity reflected in statutory text and structure must preclude a finding of enforceable rights.  329 F.3d at 1270.  The Court also found that the requirement that programs must be in "substantial conformity" with state plan requirements reflects an aggregate, rather than an individual, focus, like the FERPA provisions examined in Gonzaga.  In addition, while the Adoption Act does not contain a specific mechanism by which aggrieved individuals can enforce its provisions, instead leaving it to the Secretary to enforce the Act by withholding federal funds, the Court found that this one factor was not dispositive where Congress had not unambiguously manifested an intent to create enforceable rights.  329 F.3d at 1272-73.

The most recent circuit court decision construing the mandate of Gonzaga is the Third Circuit's opinion in Sabree v. Richman, 2004 U.S. App. Lexis 9180 (3d Cir. 2004),

which involved a suit by disabled adults seeking ICF/MR services who were attempting to enforce certain Medicaid Act provisions, 42 U.S.C. §1396a(a)(8), 1396a(a)(10) and 1396d(a)(15).  The Third Circuit reversed a district court decision which, "relying heavily on Gonzaga University, concluded that [these] Medicaid Act provisions did not unambiguously confer private rights enforceable under §1983."  Sabree at *3.  The Third Circuit analyzed Gonzaga, along with several other Supreme Court cases dealing with the issue of private rights to action, including Wright and Wilder, cited *supra*, where the Court found Congressional intent to confer rights enforceable under §1983,[7] and two other cases, Blessing, cited *supra*, and Suter v. Artist M., 503 U.S. 347 (1992), where the Court did not find enforceable rights.  The Court next examined the statutory language at issue, finding that the plaintiffs were "intended beneficiaries" of the subject provisions, though acknowledging that this might only indicate that the "plaintiffs fall within the general zone of interest the statute is intended to protect."  Sabree at *27, citing Gonzaga, 536 U.S. at 283.  Nevertheless, the Court concluded that the individual focus of the subject provisions was unambiguous.

Finally, acknowledging that "statutory construction is a holistic endeavor," the Court followed the directive of Gonzaga and turned to the broader "text and structure" of the Medicaid Act.  Sabree at *31.  The Court noted that the district court had grounded its analysis in large part on the appropriations and general introductory statement of the Act,

---

[7]  The Gonzaga Court pointedly observed that Wilder and Wright are the **only** two cases "since Pennhurst, [where the Court has] found spending legislation go give rise to enforceable rights." 536 U.S. at 280.

42 U.S.C. §1396,[8] and on §1396c, which empowers the Secretary of HHS to suspend payments to a state if it fails to "comply substantially" with the requirements of Title XIX, neither of which contain the "sort of explicit, rights-creating language" necessary to confer enforceable rights. Sabree at *35. Admitting that "plumbing congressional intent by balancing the specific language of a few discrete provisions of Title XIX against the larger structural elements of the statute is a difficult task," the Court nevertheless concluded that these "larger structural elements" did not neutralize the rights-creating language of the specific provisions at issue. This conclusion was based largely on the fact that Section 1396 had been in effect when the Supreme Court decided Wilder, and that the Gonzaga Court did not overrule Wilder. Sabree at *35-36.[9] Significantly, Sabree also was not a "waiver" case and the waiver provisions of the Medicaid Act were not considered or discussed.

### C.     THE PROVISIONS OF THE MEDICAID ACT ON WHICH PLAINTIFFS RELY FAIL TO CONFER AN ENFORCEABLE RIGHT OF ACTION

Plaintiffs seek to use 42 U.S.C. §1983 to enforce certain provisions of the Medicaid Act, 42 U.S.C. §1396 *et seq*., and its implementing regulations, in an attempt to

---

[8]  The Court acknowledged that Section 1396 "says nothing of individual entitlements or rights but reminds us that we are dealing with an agreement between Congress and a particular state," for which "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." Sabree at *33, quoting Pennhurst School, 451 U.S. at 28.

[9]  *But see*, Suter v. Artist M., 503 U.S. at 359, observing that Wilder was based upon provisions of the Boren Amendment, later repealed, which included details of the factors to be considered in determining the methods for calculating provider rates and which the Court found "actually required the States to adopt reasonable and adequate rates, and that this obligation was enforceable by the provider [plaintiffs]".

secure services under Connecticut's Waiver program.[10]  *See* Complaint at ¶¶ 1, 9, 161. Although the Complaint alleges, *inter alia*, that Plaintiffs are in need of services "in an intermediate care facility for the mentally retarded (ICF/MR) or equivalent [Waiver] Services," this claim is misleading, since virtually the entire Complaint and Plaintiffs' subsequent pleadings are directed towards securing Waiver services to which the Plaintiffs claim they are entitled, while fully repudiating any desire for facility-based (*i.e.*, ICF/MR) services.  Indeed, Plaintiffs have failed to allege any facts with regard to *any* of the 26 individual named Plaintiffs to support a claim that Plaintiffs seek or are even willing to accept services in an ICF/MR or other facility-based setting.[11]  In other words, this is a case entirely about Waiver services.  The class certified by the Court consists of individuals who (1) are eligible for DMR services and (2) have applied and are eligible for Waiver services or would apply for and be eligible for Waiver services if given the reasonable opportunity to apply; but (3) who allegedly cannot obtain the Waiver services for which they are eligible or would be eligible, (4) because of Defendants' policies and practices that are prohibited by federal law.  Order dated January 30, 2003.

Plaintiffs identify the following provisions of the Medicaid Act as the basis for several of the causes of action which they allege:

- 42 U.S.C. §1396a(a)(10) (Count I);

- 42 U.S.C. §1396a(a)(8) (Counts II and IV);

- 42 U.S.C. §1396a(a)(3) (Count VIII);

---

[10]  Although it is not clear from their Complaint, Plaintiffs may also be seeking to enforce these provisions under an implied right of action theory.  As discussed *supra* at n.1, the standard for determining whether a statute confers a private right of action is essentially the same under this theory as under § 1983.

- 42 U.S.C. §1396n(c)(2) (Count III);

- 42 U.S.C. §1396n(c)(1) (Count V); and

- 42 U.S.C. 1396n(c)(4)(B) (Count V).

The first three of these provisions are found among the general "state plan" requirement

provisions of 42 U.S.C. §1396a, and the latter three are part of the section of the Act

which provides for "waivers" of certain Medicaid requirements.

42 U.S.C. §1396a(a)(10), upon which Plaintiffs base their claims in Count I of the

Complaint, states in pertinent part that:

> A State plan for medical assistance must – . . . provide –
>
> (A) for making medical assistance available, including at least the care
> and services listed in paragraphs [42 U.S.C. §§ 1396d(a)(1)-(5),
> (17) and (21)], [12] to – (i) all [eligible] individuals [and] (ii) at the
> option of the State, to any group or groups of individuals [who
> meet certain criteria]...; [and]
>
> (B) that the medical assistance made available to any individual
> described in subparagraph (A)(i) shall not be less in amount,
> duration, or scope than the medical assistance made available to
> any other such individual.

42 U.S.C. §1396a(a)(8), upon which Plaintiffs base their claims in Counts II and IV of

the Complaint, states that a state Medicaid plan must:

> provide that all individuals wishing to make application for medical
> assistance under the plan shall have opportunity to do so, and that such
> assistance shall be furnished with reasonable promptness to all eligible
> individuals;

---

[11]    Thus, Plaintiffs fail to state a claim for which relief can be granted for services in an ICF/MR or other
institutional setting, and Defendants are entitled to summary judgment on this issue. *See* below at Section
IV, page 45.

[12]    These services include inpatient and outpatient hospital services, laboratory and X-ray services,
nursing, EPSDT and family planning, physician and dental services and nurse midwife and nurse
practitioner services. None of these services are at issue anywhere in the Plaintiffs' Complaint.

42 U.S.C. §1396a(a)(3), upon which Plaintiffs base their claims in Count VIII of the

Complaint, states that a state Medicaid plan must:

> provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness;

Plaintiffs next invoke three specific provisions of the Medicaid Act's "waiver"

section, 42 U.S.C. §1396n(c), which sets forth the conditions under which the Secretary

of HHS may grant a state a "waiver" of certain Medicaid requirements pursuant to a state

waiver plan.  Pursuant to 42 U.S.C. §1396n(c)(1):

> The Secretary may by waiver provide that the State plan approved under this title may include as "medical assistance" under such plan payment for part or all of the cost of home or community-based services (other than room and board) approved by the Secretary which are provided pursuant to a written plan of care to individuals with respect to whom there has been a determination that but for the provision of such services the individuals would require the level of care provided in a hospital or a nursing facility or an [ICF/MR] . . .

42 U.S.C. §1396n(c)(2) provides that:

> A waiver shall not be granted under this subsection unless the State provides satisfactory assurances to the Secretary that –
>
> (A) necessary safeguards (including adequate standards for provider participation) have been taken to protect the health and welfare of individuals provided services under the waiver and to assure financial accountability for funds expended with respect to such services;
>
> (B) that the State will provide, with respect to [eligible or potentially eligible] individuals, for an evaluation of the need for inpatient hospital services, nursing facilities or services in an ICF/MR;

(C) such individuals who are determined to be likely to require [an institutional] level of care . . . are informed of the feasible alternatives, if available under the waiver, at the choice of such individuals, to the provision of [such institutional services];

(D) under such waiver the average per capita expenditure estimated by the State in any fiscal year for medical assistance provided with respect to such individuals does not exceed 100 percent of the average per capita expenditure that the State reasonably estimates would have been made in that fiscal year for expenditures under the State plan for such individuals if the waiver had not been granted; and

(E) the State will provide to the Secretary annually, . . . information on the impact of the waiver . . . on the type and amount of medical assistance provided under the State plan and on the health and welfare of recipients.

Finally, 42 U.S.C. §1396n(c)(4)(B) provides that a waiver "may", consistent with paragraph c(2):

provide medical assistance to individuals (to the extent consistent with written plans of care, which are subject to the approval of the State) for case management services, homemaker/home health aide services and personal care services, adult day health care services, habilitation services, respite care and such other services requested by the State as the Secretary may approve....

Although some of the language of the Medicaid waiver provisions might arguably be called "individually focused," the principal focus of §1396n(c) clearly is on the conditions and circumstances under which a state may obtain a waiver to modify its Medicaid plan while continuing to receive federal financial participation. In this way, §1396n(c)(1) focuses on "the aggregate services provided by the State" to a particular group of Medicaid recipients rather than on "the needs of any particular person," and certainly fails to unambiguously establish new *individual rights*, thereby making it

impossible to construe a Congressional intent to confer a private right of action.

Gonzaga, 536 U.S. 273, 282, quoting, Blessing, 520 U.S. at 340.

42 U.S.C. §1396n(c)(2) sets forth a series of "assurances" which a state must provide to the Secretary as a prerequisite for receiving approval of a waiver proposal. Plaintiffs cite to a single subpart, 42 U.S.C. §1396n(c)(2)(C), which requires the State to provide assurances that individuals determined to be likely to require an "institutional" level of care will be informed of feasible alternatives "if available under the waiver" as an alternative to ICF/MR or other facility-based services. However, the "assurances" in that subpart must be read and understood in conjunction with all of the assurances which a state must provide to the Secretary in order to obtain a waiver, in particular, the assurance that "waiver" services will cost less than institutional care. For example, §1396n(c)(2)(A) requires that a state provide assurances that necessary safeguards will be taken *both* to protect the health and welfare of individuals provided services under the waiver *and also* "to assure ***financial*** accountability" for the expenditure of waiver funds. (emphasis added). Section 1396n(c)(2)(B) requires assurances to the Secretary that the state will evaluate the level of need of all eligible or potentially eligible waiver participants to assure that they require the level of care that ICF/MR or other institutional settings will provide. Section §1396n(c)(2)(D) requires the state to assure the Secretary that the estimated average per capita expenditure for medical assistance will not exceed the estimated expenditure for medical assistance had the waiver not been granted. Section 1396n(c)(2)(E) requires that the state will annually provide the Secretary with "information on the impact of the waiver." Overall, the assurances and information provided by a state are concerned with the health and welfare of Medicaid participants *in*

*the aggregate*, along with providing the *financial* accountability which will guarantee to the Secretary that a Medicaid waiver will promote the "cost-effectiveness and efficiency" of home and community-based services as an alternative to institutional care.

42 U.S.C. §1396n(c)(4)(B), cited by Plaintiffs, specifies certain services which a state "may" include as part of the "medical assistance" covered under a waiver plan. It would be misleading to suggest, however, that this section suggests any individual entitlement to these services. This is simply one of many provisions designed to give a state flexibility and discretion in designing a cost-efficient program as an alternative to funding institutional care. In fact, the accompanying subpart, §1396n(c)(4)(A), permits a state to limit waiver participation to those individuals for whom the state has determined there is a reasonable expectation that the amount of medical assistance provided under the waiver would not exceed the amount of medical assistance provided if the waiver did not apply. Like the previous subparts, these provisions balance the state's flexibility in creating a waiver program tailored to its needs with a concern for the fiscal accountability which will promote overall "cost-effectiveness and efficiency."

Other subparts of 42 U.S.C. §1396n contain provisions for monitoring the implementation of waivers, provisions for specific types of waivers, for terminating waivers for noncompliance, and so on. Taken as a whole, the waiver provisions, including the specific subparts cited by the Plaintiffs, are designed to allow a state to design a waiver plan that includes coverage for selected home and community-based services as an alternative to facility-based services, while guaranteeing the "cost-effectiveness" and "efficiency" of this alternative. While this expansion of "medical assistance" to include a range of home and community-based services certainly

"benefits" certain groups of Medicaid recipients, the "benefit" to individual recipients certainly cannot be said to be the unambiguous focus of the statute.

In addition, the Medicaid Act's waiver provisions do not contain "the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights" in individuals, like the examples cited in Gonzaga from Title VI of the Civil Rights Act and Title IX of the Educational Amendments of 1974.  Rather, like the statutes at issue in Gonzaga, Blessing, Taylor, and other relevant cases, the waiver provisions are concerned primarily with the "contractual" relationship between the state and the federal governments and the aggregate services to be provided.  In this way, the statutory language is "two steps removed" from the interests of individual program recipients.  Gonzaga, 536 U.S. at 287.  See also, Alexander v. Sandoval, 532 U.S. 275, 289 (2001) ("Statutes that focus on the person [i.e., the state] being regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons." (Citation omitted)).  To the extent that these provisions combine elements of so-called individually focused language as well as the kind of "funding-prohibition language" which Courts like Gonzaga and Taylor have held do not confer individual rights, an "unambiguous" intent to create an enforceable right cannot be inferred.  Taylor, 313 F.3d at 785.  "If they provide some indication that Congress may have intended to create individual rights, and some indication it may not have, that means Congress has not spoken with the requisite 'clear voice.'  Ambiguity precludes enforceable rights."  31 Foster Children v. Bush, 329 F.3d at 1270.

This same analysis applies to those statutory provisions Plaintiffs cite which apply generally to all state Medicaid programs.  Not only do these provisions fail to

"unambiguously confer" rights when considered independently, they certainly cannot be construed to do so when viewed in light of the overall "text and structure" of the Medicaid Act, as required under a <u>Gonzaga</u> analysis. *See also*, <u>United States v. Pacheco</u>, 225 F.3d 148, 154 (2d Cir. 2000), *cert. denied*, 533 U.S. 904 (2001) ("The 'whole act' rule of statutory construction exhorts [a court] to read a section of a statute not 'in isolation from the context of the whole Act' but to 'look to the provisions of the whole law, and to its object and policy'." (citation omitted)). Moreover, these general provisions also must be construed in concert with the Act's waiver provisions, given Plaintiffs' claims to entitlement under the State's Waiver program. In addition, to the extent that these provisions are found to include both individually focused language and language that has a "system-wide" or "aggregate" focus, they cannot be construed as unambiguously creating a private right of action for Plaintiffs to enforce.

In Count I of the Complaint, Plaintiffs allege that Defendants have failed to provide ICF/MR[13] and waiver services[14] to class members in an "amount, duration and scope" comparable to that provided to other Medicaid recipients, citing 42 U.S.C. §1396a(a)(10). Subpart 1396a(a)(10)(A) requires that a state plan must provide for making available at a minimum certain specific types of services to certain categories of individuals described in the statute, and distinguishes between the mandatory and

---

[13]  As discussed above, the Complaint contains no allegations that even a single named class plaintiff has requested or even desires services in an ICF/MR. This action is only about Plaintiffs' claim to be entitled to *Waiver* services.

[14]  It must be noted that Plaintiffs fail to distinguish between the direct provision of *services* and the *funding* of those services through the Medicaid program. As discussed *supra*, Medicaid is a program by which a state provides *financial* assistance rather than direct services, a distinction occasionally missed by some courts. *See* <u>Bruggeman v. Blagojevich</u>, 324 F.3d at 910.

optional services to be covered by a state plan.  Subpart (a)(10)(B) provides that the

medical assistance made available under subpart (a)(10)(A) shall not be less in "amount,

duration or scope" than that made available to other individuals.  Other subparts in this

section, *inter alia*, require that a plan must describe any groups of individuals for whom

medical assistance is to be made available other than those included in subpart

(a)(10)(A), must provide for making medical assistance available for certain qualified

Medicare beneficiaries and COBRA-qualified beneficiaries (at the state's option), and

provide rules for applying eligibility criteria of the supplemental security income (SSI)

program for individuals not receiving SSI.  42 U.S.C. §1396a(a)(10)(C), (E), (F) and (G).

Thus, when viewed in isolation there might appear to be some "individually-

focused" language in subpart 1396a(a)(10)(B) regarding the "amount, duration or scope"

of medical assistance to be made available to Medicaid recipients, but this language must

be considered in the context of the entire §1396a(a)(10), which describes the many

different categories of individuals for whom medical assistance must be made available

or may be made available at the state's discretion.  In other words, this section focuses on

the *system-wide* operation of the Medicaid program and the categories of individuals who

are to be covered, rather than on "the needs of any particular person."  Therefore, this

section is not designed to confer individual rights  *See* Gonzaga at 281-82.

The "system-wide" or "aggregate" focus of these provisions is demonstrated even

more clearly when §1396a(a)(10) is considered within the broader "text and structure" of

the Act, beginning with the Act's introductory, appropriations section, §1396.  Section

1396 states that the Act's *purpose* is to assure that sufficient funds are appropriated each

year to enable each state to furnish medical assistance in accordance with plans approved

by the Secretary.  After setting forth the mandatory and optional contents to be included

in a state Medicaid plan in §1396a(a), the 26 other subparts of §1396a impose a range of

requirements on state Medicaid programs.  Section 1396b then provides details regarding

the federal financial participation which the federal government will provide for

qualifying expenditures under approved state plans.  Section 1396c then provides that, if

there is a failure to "comply substantially" with the requirements of a state plan, the

Secretary may cut off or limit further payments to the state.[15]  This authorization for the

Secretary to take corrective action against a state which fails to "comply substantially"

with the provisions of the Medicaid Act is analogous to that found in the provisions

examined by the Supreme Court in Blessing and Gonzaga (Title IV-D of the Social

Security Act and FERPA, respectively) where the Court suggested that individual rights

will not be found in a spending clause statute where the state is subject only to the loss of

federal funds for failing to comply substantially with the statute.  Gonzaga, 536 U.S. 288;

Blessing, 520 U.S. at 335, 343.

   The other specific provisions cited by Plaintiffs, 42 U.S.C. §1396a(a)(3) and (8),

also contain what arguably might be characterized as individually-focused language.

Upon closer analysis, however, these provisions clearly are not designed to create

enforceable "rights" in particular individuals, but rather impose duties upon a state to

provide, through its Medicaid plan, opportunities for fair hearings to individuals whose

claims for medical assistance have been denied or not acted upon with reasonable

promptness (§1396a(a)(3)), and opportunities for individuals to apply for medical

assistance and to have that assistance furnished with reasonable promptness

---

[15]   The substantial compliance standard set forth in Section 1396c applies to all of the statutory provisions
of the Medicaid Act.

(§1396a(a)(8)). "Statutes that focus on the person being regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons." Gonzaga, 536 U.S. at 287, quoting, Alexander v. Sandoval, 532 U.S. 275, 289 (2001). Like §1396a(a)(10), these specific provisions must be read in the context of the entire Act, which describes a "contractual" relationship between the federal and state governments whereby federal financial participation is conditioned on the state's "substantial compliance" with numerous statutory requirements.

It should be noted that some courts have mistakenly construed 42 U.S.C. §1396a(a)(8) as imposing an enforceable right in program recipients to receive covered medical services promptly and/or a corresponding duty on the state Medicaid agency to ensure prompt provision of services by participating providers. The leading case for this proposition is Doe v. Chiles, 136 F.3d 709 (11th Cir. 1998), which was decided five years before Gonzaga. Doe v. Chiles, and cases which have followed, have typically erred by construing §1396a(a)(8) in isolation from the other provisions of the Act, and also by typically failing to recognize that Medicaid imposes an obligation on the states to provide *financial* assistance rather than medical services, an error highlighted by the court in Bruggeman v. Blagojevich, 324 F.3d 906, 910.[16]

In addition, since Plaintiffs' claims are fundamentally premised upon a claimed entitlement to Waiver program services, the general Medicaid provisions which Plaintiffs invoke also must be read and understood in conjunction with the waiver provisions of

---

[16]   In addition, the conclusions of Doe v. Chiles with regard to Medicaid recipients' entitlement to prompt services is called into question by the Eleventh Circuit's more recent opinion in 31 Foster Children v. Bush, which strongly signaled that Court's determination to adhere to the standards clarified by the Gonzaga Court, requiring a careful analysis of a statute's text and structure before inferring enforceable rights from the language of a funding statute. *See* 329 F.2d at 1270.

§1396n(c).  For example, in Count I, Plaintiffs allege that Defendants are failing to

provide *Waiver* services to class members in an "amount, duration or scope" comparable

to the *ICF/MR* services provided to other Medicaid recipients.  When Plaintiffs allege in

Counts II and IV that Defendants have failed to provide class members with an

opportunity to apply for "services" and/or failed to provide those services with reasonable

promptness, Plaintiffs are referring to *Waiver* services, which are subject to the

conditions set forth in §1396n(c).  And in Count VIII, the "recipients" to whom Plaintiffs

refer are purportedly "Waiver" recipients for whom Plaintiffs allege that Defendants have

failed to provide proper notice and hearings.

        Thus, following the mandate of <u>Gonzaga</u>, <u>Taylor</u>, and other relevant cases,

Plaintiffs' statutory claims must be viewed and analyzed in light of the Medicaid Act's

waiver provisions as well as within the overall text and structure of the Medicaid Act.

This is consistent with well-established rules of statutory construction which apply

generally.  *See*, *e.g.*, <u>Saks v. Franklin Covey Co.</u>, 316 F.3d 337, 345 (2d Cir. 2003), citing

<u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 341 (1997) (the plain meaning of a text "can

best be understood by looking to the statutory scheme as a whole and placing the

particular provision within the context of that statute.");  <u>United States v. Pacheco</u>, 225

F.3d 148, 154 (2d Cir. 2000) (a specific provision must be interpreted "in a way that

renders it consistent with the tenor and structure of the whole act or statutory scheme of

which it is a part.");  *Accord*, <u>United States v. Bonanno Organized Crime Family</u>, 879

F.2d 20, 24 (2d Cir. 1989) (citing 2A Sutherland, <u>Statutory Construction</u>, § 46.05 (4th ed.

1984)).  This point is significant because not only does the Medicaid Act demonstrate a

"multi-faceted statutory scheme," the focus of which is on "system-wide" performance

and the aggregate needs of recipients evidenced in part by the requirement that a state

must "comply substantially" with the Act's requirement to prevent the termination of

federal funding, but the Act's waiver provisions are particularly focused on the state's

providing assurances that any home and community-based services it chooses to offer as

an alternative to institutional care will, in the aggregate, cost less than institutional care.

*See* Blessing, 520 U.S. at 344-45.  Given the overall "aggregate" or "system-wide" focus

of the Medicaid Act and its waiver provisions in particular, the statutory language upon

which Plaintiffs rely cannot be said to *unambiguously* express a Congressional intent to

confer any new individual rights enforceable by §1983.  Blessing, 520 U.S. at 344-45;

Taylor, 313 F.3d at 786.

**D.      THE FEDERAL REGULATIONS CANNOT INDEPENDENTLY
CONFER A PRIVATE RIGHT OF ACTION**

In addition to claiming a right to enforce statutory provisions of the Medicaid Act,

Plaintiffs also base their claims in part upon various sections of the Act's implementing

regulations.[17]   However, the clear weight of authority holds that a federal regulation

cannot confer federal rights that are enforceable in a §1983 action, at least to the extent

that the regulation purports to do more than merely "clarify" or "flesh out" the rights

which Congress has created in a statute.  For example, in Save Our Valley v. Sound

Transit, 335 F.3d 932, 935-36 (9th Cir. 2003), the Court of Appeals for the Ninth Circuit

concluded, based upon controlling Supreme Court precedent, that a federal agency's

regulations can never create individual rights enforceable through §1983.  This

conclusion follows necessarily from the broader principle of constitutional law "that

---

[17]   *See* Complaint at Part VI, "Causes of Action," citing 42 C.F.R. §§440,240, 435.930, 441.302(d), 435.906, 431.200-431.246.

Congress, rather than the executive, is the lawmaker in our democracy." Id. at 939.  This

holding follows decisions in the Third, Fourth and Eleventh Circuits which likewise have

held that an agency regulation cannot create an individual federal right enforceable

through §1983.  See, South Camden Citizens in Action v. New Jersey Dept' of

Environmental Protection, 274 F.3d 771, 784 (3d. Cir. 2001), cert. denied, 536 U.S. 939

(2002);  Harris v. James, 127 F.3d 993, 1008 (11th Cir. 1997);  Smith v. Kirk, 821 F.2d

980, 984 (4th Cir. 1987).  Focusing upon Congress' intent, paired with the Supreme

Court's treatment of regulations as mere "administrative interpretations of the statute,

these courts have concluded that the Supreme Court's §1983 jurisprudence is founded on

the principle that Congress creates rights by statute, and that valid regulations merely

"define" or "flesh out" the contents of those rights.  335 F.3d at 936;  274 F.3d at 790;

127 F.3d at 1008-09 n.3.[18]

     In Alexander v. Sandoval, 532 U.S. 275 (2001), the Supreme Court rejected a

contention by both the Government and class plaintiffs that regulations which contain

rights-creating language must be privately enforceable.  As the Court explained:

> Language in a regulation may invoke a private right of action that
> Congress through statutory text created, but it may not create a right
> that Congress has not.  Thus, when a statute has provided a general
> authorization for private enforcement of regulations, it may perhaps be
> correct that the intent displayed in each regulation can determine
> whether or not it is privately enforceable.  But it is most certainly
> incorrect to say that language in a regulation can conjure up a private
> cause of action that has not been authorized by Congress.  Agencies
> may play the sorcerer's apprentice but not the sorcerer himself.

---

[18]  Two Circuit Courts, the D.C. Circuit in Samuels v. District of Columbia, 770 F.2d 184 (D.C. Cir. 1985) and the Sixth Circuit in Loschiavo v. City of Dearborn, 33 F.3d 548 (6th Cir. 1994), cert. denied, 513 U.S. 1150 (1995), have held that regulations can create individual rights.  But see, discussion of these cases in Save Our Valley, 335 F.3d at 942-43, suggesting the flaws in their underlying reasoning.

532 U.S. at 291.  Thus, finding an enforceable right in a regulation where the underlying

statute by itself did not create federal rights enforceable under §1983 "would be

inconsistent with the driving force of the Supreme Court precedent requiring

Congressional intent to create federal rights and with the Supreme Court's directive that

courts must find that Congress has unambiguously conferred federal rights on the

plaintiffs."  Harris v. James, 127 F.3d at 1009.   Plaintiffs suing under §1983 must

demonstrate that a statute, not a regulation, confers an individual right.  As an agency

interpretation of a statute, a regulation may be relevant in determining the scope of the

right conferred by Congress, but the inquiry must focus squarely on Congress' intent.

Save Our Valley, 335 F.3d at 943-44;  South Camden Citizens, 274 F.3d at 783, 788.

Thus, the language of the regulations cited by Plaintiffs in support of their claims cannot

be interpreted to confer a private right of action, to the extent that the statutes upon which

the regulations are based themselves do not confer such a right.

**III.    DEFENDANTS ARE ENTITLED TO PARTIAL JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' ADA CLAIMS**

    **A.    THE ADA DOES NOT REQUIRE A STATE TO CHANGE THE SCOPE OF SERVICES THAT IT PROVIDES UNDER MEDICAID**

In seeking relief pursuant to the Americans With Disabilities Act (ADA), the

Plaintiffs invoke the mandate of the ADA in broad terms, for example, by claiming that

"the denial of HCBW services as stated" denies class members "the opportunity to an

individualized, person-centered placement in the community, to the maximum extent

practicable."  Complaint at ¶156.  To the extent that Plaintiffs are attempting to use the

ADA as a means for obtaining kinds of services and levels of services which exceed the

scope of services currently available under the State's approved Medicaid plan, including its federally approved Waiver plan, Plaintiffs ADA claims must fail.

The Second Circuit has ruled that while disabilities statutes such as the ADA require that a state must make reasonable accommodations to assure disabled individuals access to existing programs, these laws do not require that a state provide additional substantive benefits. For example, in Rodriguez v. City of New York, 187 F. 3d 611, 618 (2d Cir. 1999), the Court found that the State did not violate the ADA by failing to provide safety monitoring devices to a subset of individuals with disabilities. "The ADA requires only that a particular service provided to some not be denied to disabled people." Rodriguez, 187 F. 3d at 618, citing Doe v. Pfrommer, 148 F. 3d 73, 83 (2d Cir. 1998). In Rodriguez, the services that the State provided to the mentally disabled were no different from those services provided to the physically disabled. Neither the mentally nor physically disabled were provided with independently tasked safety monitoring. What was challenged was not discrimination against the disabled, but rather the substance of the services. "Thus, New York cannot have unlawfully discriminated against appellees by denying a benefit that it provides to no one." Rodriguez, 187 F. 3d at 618. The Court found that the issue in Rodriguez was "whether New York discriminates on the basis of a mental disability with regard to the benefits it does provide. Because New York does not 'task' safety monitoring as a separate benefit for anyone, it does not violate the ADA by failing to provide this benefit to appellees." 187 F.3d at 619.

Similarly, in Doe v. Pfrommer, the Court rejected a Rehabilitation Act claim by a disabled individual who sought a job coach. The court reasoned, "what Doe ultimately seeks to challenge is not illegal discrimination against the disabled, but the substance of

the services provided to him through VESID [Vocational Educational Services for Individuals with Disabilities].  To provide the modifications he seeks would not serve the purpose of leveling the playing field with respect to the benefits under VESID available to the non-handicapped." Doe v. Pfrommer, 148 F. 3d at 84.

The Supreme Court has stated that "Medicaid programs do not guarantee that each recipient will receive that level of health care precisely tailored to his or her particular needs." Alexander v. Choate, 469 U.S. 287, 303 (1985).  "[T]he disabilities statutes do not require that substantively different services be provided to the disabled, no matter how great their need for the services may be.  They require only that covered entities make 'reasonable accommodations' to enable 'meaningful access' to such services as may be provided, whether such services are adequate or not." Wright v. Giuliani, 230 F.3d 543, 548 (2d Cir. 2000).  Moreover, "the disabilities statutes do not guarantee any particular level of medical care for disabled persons, nor assure maintenance of services previously provided." Cercpac v. Health and Hospitals Corp., 147 F. 3d 165, 168 (2d Cir. 1998).  Thus, the Cercpac Court affirmed the dismissal of Rehabilitation Act and ADA claims brought by disabled children who were transferred to another rehabilitation center with fewer services.  147 F.3d at 168.

The Complaint does not clearly identify the specific types of services which Plaintiffs seek and which they allege are subject to their ADA claims.  However, it certainly appears that the Plaintiffs are demanding services which exceed the scope of services currently provided under the State's Medicaid Plan.  For example, Plaintiffs claim that a question of law common to the class is whether it is permissible for the State to refuse to provide "residential services" that "*are not currently available*" to Waiver

recipients "needing such services." Complaint at ¶112 (emphasis added).[19] In other words, Plaintiffs claim to be entitled to receive any type or level of residential services that any individual Plaintiff *needs* (based on an undefined and poorly articulated concept of "need"). However, to the extent that such services are not available to other individuals under the State's Medicaid Plan, and specifically its Waiver plan, class members cannot claim entitlement to such services based upon the ADA. Rodriguez, 187 F.3d at 618; Cercpac, 147 F.3d at 168.

Therefore, to the extent that Plaintiffs claim that the ADA entitles them to require the State to change the scope of services it currently provides under its approved Medicaid plan, including its approved Waiver plan, Plaintiffs' claims fail as a matter of law.

**B.    INDIVIDUALS WHO ARE NOT CURRENTLY INSTITUTIONALIZED ARE PRECLUDED FROM ASSERTING AN ADA CLAIM BASED UPON THE ADA'S "INTEGRATION MANDATE"**

Plaintiffs allege that they are not being provided services in the most integrated setting appropriate to their needs. *See, e.g.*, Complaint at ¶¶ 7, 12, 109, 112, 146, 154, 160. This claim is based upon Title II of the ADA, 42 U.S.C. §12132[20] and its implementing regulation, 28 C.F.R. § 35.130(d). *See* Complaint at ¶ 171. The latter is commonly referred to as the "integration regulation" of the ADA, which states that: "A public entity shall administer services, programs, and activities in the most integrated

---

[19]  Besides claiming to seek "residential support services," generally, Plaintiffs also claim to be seeking "HCBW funding to pay for community residential placements." *See, e.g.*, Complaint at ¶¶25, 33, 43. If this is understood to encompass payment for room and board, as it appears, this would be a direct violation of the federal Medicaid law governing the waiver program. 42 U.S.C. §1396n(c)(1).

[20]  This section states: "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity."

setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). [21]

The leading case construing Title II of the ADA and its implementing "integration regulation" is Olmstead v. Zimring, 527 U.S. 581 (1999), in which mentally disabled patients living in state institutions who desired placement in community settings challenged their institutional confinement. Addressing the issue of whether and in what circumstances the ADA and its "integration mandate" require states to place individuals with mental disabilities in community settings rather than in institutions, the Supreme Court concluded that the institutional isolation of individuals with mental disabilities is a form of discrimination which the ADA was designed to remedy. The Court then held that placement in less restrictive community settings is required when (a) the state's treating professionals determine that community placement is appropriate, (b) the placement is not opposed by the affected individual, and (c) the placement can be reasonably accommodated by the state without a fundamental alteration of the state's applicable programs. 527 U.S. at 607.

Like Olmstead, cases applying Title II of the ADA and its implementing regulations typically involve suits by institutionalized individuals seeking placement in less restrictive and more "integrated" community settings. *See, e.g.*, Frederick L. v. Department of Public Welfare, 364 F.3d 487 (3rd Cir. 2004) (patients in state mental health institution sought placement in community-care settings); Helen L. v. DiDario, 46

---

[21]  As discussed above, a regulation interpreting a federal statute cannot confer federal rights independent of the statute which the regulation defines or clarifies. Although Defendants accept, only for the sake of the instant argument, the validity of the ADA's integration regulation, Defendants do not waive the right to challenge this regulation as overly broad and beyond the scope of the statute. Notably, the Supreme Court stated as a caveat in Olmstead that the Court was not determining the validity of this regulation. 527 U.S. at 592.

F.3d 325 (3rd Cir. 1995) (ADA applied where nursing home resident who qualified for state home-care program sought services to be provided in own home); <u>Messier v. Southbury Training School</u>, 1999 WL 20910 (D. Conn.) (ADA could apply where mentally disabled residents of institution sought treatment in less restrictive community settings).  Courts have also found that Title II of the ADA may apply where disabled individuals living in community settings are unable to access needed services unless they agree to move into nursing homes or other institutional settings.  *See, e.g.*, <u>Fisher v. Oklahoma Health Care Auth.</u>, 335 F.3d 1175, 1181 (10th Cir. 2003) (holding that ADA's integration mandate prevents program beneficiaries from being forced into segregated institutionalization); <u>Townsend v. Quasim</u>, 328 F.3d 511 (9th Cir. 2003) (disabled plaintiffs unable to receive Medicaid pharmacy benefits unless they agreed to move to nursing homes); <u>Martin v. Taft</u>, 222 F. Supp.2d 940, 981 (S.D. Ohio 2002) (ADA's integration mandate applied where class members resided in institutions or could only receive services if they submitted to institutionalization).  As these cases demonstrate, the focus of Title II and its "integration mandate" is to prevent the unnecessary segregation and isolation of disabled persons in institutions as a form of discrimination.

In the instant case, however, only a small percentage of the putative class members identified by the Plaintiffs are alleged to reside in institutions and to seek placement in less restrictive and more integrated community settings.  *See* Complaint at ¶111 (claiming that approximately 130 out of approximately 2000 live in institutions).[22]

---

[22]  Defendants recognize that, with regard to the relatively small sub-class of Plaintiffs who are institutionalized, summary judgment may not be appropriate on this issue, since issues of material fact are in dispute as, for example, whether these individuals' treating professionals have recommended community placement, whether the individuals oppose such placements, and whether such placements might constitute a fundamental alteration in Defendants' service system.

Otherwise, according to Plaintiffs, the class consists of approximately 2000 individuals who are *not* in institutions and who, by and large, are living in family homes, *i.e.*, in the community.  For example, according to the Complaint, 22 of the 26 individual named Plaintiffs reside with parents or other relatives.  Not only are these individuals not living in "restrictive" or "segregated" institutional settings, the Complaint does not even allege that these Plaintiffs are threatened with or are otherwise in immediate danger of institutionalization.  In other words, the great majority of putative class members are not seeking to be "integrated" into less restrictive community settings, since they already live in the community with members of their families and interact with non-disabled people.  Rather, these Plaintiffs seek to transfer to *different* community settings which, in some cases (like group homes), arguably may even be *more* restrictive and less "integrated" than their current residences.  Moreover, in many cases, the reasons stated in the Complaint as to why certain individuals seek alternative residential placements has nothing to do with "integration" into the community, but rather has to do with alleged burdens on their parents or other family members.  This does not remotely implicate the concerns about segregation and discrimination which the ADA and its "integration mandate" were designed to remedy.

Therefore, because the Plaintiffs are not "segregated" in institutions and do not seek "integration" into the community, and are not threatened with institutionalization in order to receive appropriate services, Defendants are entitled to judgment as a matter of law on the claim that Defendants are violating Title II of the ADA.[23]

---

[23]   As stated above, although Defendants dispute Plaintiffs' factual allegations with regard to the relatively small percentage of putative class members who reside in institutions, summary judgment may not be appropriate with regard to those individuals at this stage of the proceedings.

IV.    **PLAINTIFFS FAIL TO STATE A CLAIM FOR ICF/MR BASED SERVICES**

As Plaintiffs note, the certified class in this case is defined in part as including those individuals "who cannot obtain the HCBW services for which they are presently eligible or for which they would be eligible, if given the reasonable opportunity to apply . . . ." Complaint at ¶110. In other words, this case is fundamentally about Plaintiffs' claims to be entitled to home or community-based Medicaid waiver (HCBW) services as an *alternative* to Medicaid services provided to developmentally disabled individuals in an Intermediate Care Facility for the Mentally Retarded (ICF/MR) or other "institutional" setting.[24] Thus, when Plaintiffs claim they are entitled to a choice between traditional ICF/MR services and services under the State's Medicaid Waiver, they are claiming a right to waiver services *instead of* services provided in an ICF/MR or other facility-based setting.

However, Plaintiffs allege as part of their "Causes of Action" that Defendants have failed "to provide *ICF/MR* and waiver services in adequate amount duration and scope . . ." [Complaint at ¶161]; failed to "inform class members of the availability of *ICF/MR services*"; [Complaint at ¶164]; failed to allow class members "to apply for or receive" such ICF/MR services [<u>Id</u>.]; failed to advise persons "wishing to apply for *ICF/MR* and HCBW [services]" about the evaluation process and availability of services [Complaint at ¶167]; and failed to provide "appropriate and prompt opportunities for *ICF/MR services*" [Complaint at ¶172]. (emphasis added). In addition, the "Relief

---

[24]   The Medicaid Act's "waiver" provisions identify three types of "institutions," the ICF/MR, the hospital and the nursing facility, and require that, in order to receive home and community-based services, an individual must have been determined to be likely to require the level of care provided in one of these facilities. *See, e.g.*, 42 U.S.C. §1396n(c)(2)(C).

Requested" by Plaintiffs includes a request that class members be offered *"an ICF/MR placement* or alternative HCBW funding with reasonable promptness," and that class members be provided "with appropriate community based waiver *or ICF/MR level services.*" Complaint at 68 (emphasis added).

Despite these allegations and requests for relief relating to ICF/MR services, the factual statements and specific allegations in the Complaint relating to the twenty-six (26) named Plaintiffs demonstrate that neither the individual named Plaintiffs nor the class as a whole seek, desire or are requesting Medicaid services in an ICF/MR or other "institutional setting."

Indeed, a review of the specific allegations of the Complaint demonstrates that, to the contrary, the individual named Plaintiffs clearly repudiate having any desire for ICF/MR services. Instead, each and every named Plaintiff seeks "waiver" funding for community-based placements as an alternative to ICF/MR placement. For example, each of the named Plaintiffs S. Kuzial, K. Ulsh, S. Reichenbach, M. Vigorito, S. Small, P. Sage, J. Pratt, H. Bouffard, S. Bouffard, J. Broderick, J. Connolly, M. Damiano, C. DePanfilis, E. Hart, R. Janelle III, G. Knowles, K. Merchant, S. Miller, J. Seaver, A. Steinfeld, C. Sullivan and W. Sullivan, is alleged to live with his or her parents or other relatives and to "require" alternative community-based placement, whether an independent apartment, group home or other supported living arrangement.[25]  Complaint at ¶¶13-19, 24-31, 36-107.  The Complaint also identifies four Plaintiffs as living in settings other than family homes (L. Greca as living in an ICF/MR, R. O'Kane living

---

[25]  By definition, these individuals who live in family homes are already living in "community" settings.

part-time in a respite facility, M. Weglowski living in a group home, and L. O'Neill living in a nursing facility), but in each of these cases, the Complaint alleges that the individual Plaintiffs also seek community residential placements as *alternatives* to ICFs/MR or other institutional settings.  In the 84 paragraphs containing specific allegations relating to the 26 named Plaintiffs, there is not a single statement suggesting that even one Plaintiff desires, seeks or requests services in an ICF/MR or similar setting.

Therefore, because the Plaintiffs have failed to state a claim upon which relief may be granted relating to services in an ICF/MR or similar setting, Defendants are entitled to judgment as a matter of law on this issue.

## <u>CONCLUSION</u>

The Defendants request that judgment be granted in their favor as a matter of law as described in the foregoing arguments.

Respectfully submitted,
DILWORTH PAXSON LLP

_____
THOMAS B. YORK
Fed. Bar No. ct 17663

112 Market Street, 8th Floor
Harrisburg, PA 17101
Tel.: (717) 236-4812

Attorney for the Defendants

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served

via facsimile and also via first-class, postage-prepaid mail on this 16th day of August,

2004 on the following individuals:

David C. Shaw, Esq.
34 Jerome Ave.
Suite 210
Bloomfield, CT 06002

Hugh Barber, Esq.
Assistant Attorney General
Office of the Attorney General
P.O. Box 120 (55 Elm Street)
Hartford, CT 06141-0120

Thomas Fiorentino, Esq.
Assistant Attorney General
Office of the Attorney General
P.O. Box 120 (55 Elm Street)
Hartford, CT 06141-0120

Mark Carta, Esq.
Rucci, Burnham, Carta & Edelberg, LLP
30 Old Kings Highway South, P.O. Box 1107
Darien, CT 06820

James P. Welsh, Esq.
Director, Legal & Government Affairs
CT Dept. of Mental Retardation
460 Capitol Avenue
Hartford, CT 06106

_____
Thomas B. York

21965_1